IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                               )
                Plaintiff,     )
                               )
     v.                        )      No.  07 CR 298
                               )
EDWARD R. VRDOLYAK,            )
                               )
                Defendant.     )

<u>MEMORANDUM OPINION AND ORDER</u>

Chicago attorney Edward R. Vrdolyak ("Vrdolyak") is charged by the superseding indictment in this case ("Indictment") with aiding and abetting one act of mail fraud and six acts of wire fraud in violation of 18 U.S.C. §§2, 1341, 1343 and 1346.[1] Vrdolyak has moved under Fed. R. Crim. P. 12(b) for a dismissal of those seven counts[2] on several grounds:

1.  It is not alleged in the Indictment that the Finch University of Health Sciences/Chicago Medical School ("Medical School")[3] suffered any pecuniary harm as a result of a scheme that he devised with Stuart Levine ("Levine"), a member of the Medical School's Board of Trustees.

2.  In addition, the Indictment fails to allege that

---

[1]  Those and other provisions of Title 18 will hereafter be cited simply as "Section -- ," omitting the prefatory "18 U.S.C."

[2]  Vrdolyak is also charged in Count Eight with one violation of Section 666(a)(2) (bribery), but he has not challenged the sufficiency of that count in his motion.

[3]  It is now known as the Rosalind Franklin University of Medicine and Science.

Vrdolyak knew Levine owed a fiduciary duty to the Medical School. As a result, Vrdolyak contends, nothing in the Indictment supports the contention that he <u>knowingly</u> aided and abetted a breach of that duty as required by Section 2.

3. If the facts set forth in the Indictment suffice to make out an alleged violation of Section 1346, that statute is unconstitutionally vague as applied in this case.

This Court has considered all of Vrdolyak's arguments and the government's responses. For the reasons set out here, Vrdolyak's motion to dismiss Counts One through Seven of the Indictment is denied in its entirety.

<u>Allegations in and Supplemental to the Indictment</u>

According to the Indictment, in 2002 the Medical School acquired the Dr. William M. Scholl School of Podiatric Medicine, which owned an improved parcel of real estate at 1001 N. Dearborn Street in Chicago ("Scholl Property")(¶1.a).[4] Later that same year the Medical School decided to sell the Scholl Property (¶1.f). Responsibility for overseeing the sale fell to Levine, an attorney and businessman who served on the Medical School's Board of Trustees and chaired its real estate committee (¶¶1.c, 1.f.i). As a trustee Levine knew that the Medical School had a policy prohibiting its entry into any transaction that would

---

[4] All citations to the Indictment will take the form in the text where they are drawn from Count One (all of the other challenged counts incorporate Count One ¶¶1-18 by reference).

result in any kind of financial gain or advantage for one of its trustees unless the trustee both disclosed his or her interest to the Board and abstained from voting on the transaction (¶1.f.ii). Levine annually signed a Conflict of Interest Disclosure Statement acknowledging that he understood the policy and agreed to abide by it (id.).

In or about 2002 Levine spoke with Vrdolyak about the proposed sale of the Scholl Property (¶4). They agreed that Vrdolyak would identify a buyer for the property and that Levine would use his position as a trustee to ensure that Vrdolyak's buyer secured the property from the Medical School (id.). In exchange for his efforts Levine would receive a kickback[5] from the buyer (id.).

Vrdolyak later told Levine that Smithfield Properties Development LLC ("Smithfield"), a company that purchased and developed real estate throughout the metropolitan Chicago area, was interested in purchasing the Scholl Property (¶¶1.d, 5). At Vrdolyak's direction Levine met with Smithfield and began to negotiate with it exclusively (¶5). Levine also directed other agents and employees of the Medical School not to pursue other prospective purchasers and to reject any other inquiries they

---

[5] Although that is more precisely a "payment," for such a payment would not diminish the agreed-upon price vis-a-vis the Medical School, the term "kickback" is used in the Indictment and the parties' submissions. This opinion will do the same in the interest of consistency.

received about the Scholl Property (¶6).

In March 2003 Levine used his position on the Medical School Board to induce the other trustees to vote to negotiate an agreement with Smithfield for its purchase of the Scholl Property for approximately $9.5 million (¶8). In wielding his influence, Levine both spoke in favor of and voted for the negotiation with Smithfield (id.). But in May 2003 the Medical School learned that other purchasers were willing to pay more--up to $15 million--for the Scholl Property (¶9).

According to prospective evidence not adverted to in the Indictment but that the United States has conveyed to this Court more recently (see U.S. Third Supp. Mem. 5):[6]

> During approximately the last week of May 2003, a representative of [a second] prospective purchaser who had proposed an offer of $15 million sent a letter directly to each member of the [Medical School] Board of Trustees and therein stated that his client was interested in buying the Scholl Property for approximately $15 million.

Even further, according the same source of post-Indictment information, "At about the same time, a representative of a third prospective purchaser made a comparable offer to [the Medical School]" (id., emphasis added). Levine learned about that last offer directly from the third prospective purchaser and "understood that this purchaser expressed a willingness to buy

---

[6] See Appendix as to the circumstances under which such supplemental materials were provided, and also as to the reference citations employed in this opinion.

4

the Scholl Property for approximately $15.5 million" (id. at 6).

As alleged in the Indictment, Levine shared the information about the competing offers with both Vrdolyak and Smithfield, after which Vrdolyak told Levine that Smithfield was willing to match the $15 million figure (¶¶9-10). Levine and Vrdolyak then agreed that Levine would use his position as a trustee to ensure that the Medical School accepted Smithfield's $15 million offer (¶10). In turn Smithfield would compensate Vrdolyak, who would then pass along a portion of that compensation to Levine (id.).

Smithfield advised the Medical School of its $15 million offer on or about June 5, 2003 (¶11). On the same day the Board--with Levine both voting and influencing the votes of other trustees--agreed to accept that offer and to enter into an agreement under which the Medical School would sell Smithfield the Scholl Property (¶12). That deal was completed about November 1, 2004, when the Medical School and Smithfield closed the purchase agreement transaction and Smithfield acquired the Scholl Property (¶14).

Around the same time Vrdolyak was involved in his own negotiations with Smithfield through which Vrdolyak and Smithfield agreed that Smithfield would pay Vrdolyak, as a finder's fee, an amount equal to 10% of the Scholl Property purchase price, or $1.5 million (¶13). That fee would be paid at some future date after development of the Scholl Property had

been completed and after repayment of certain expenses and financing (id.).  Vrdolyak gave a copy of that agreement to Levine (id.).  Continuing through June 2006 Vrdolyak and Levine had a series of discussions as to when Vrdolyak would collect the $1.5 million from Smithfield and how the two would arrange for Levine to receive his share of that sum secretly (¶15).  Vrdolyak knew that Levine had never disclosed to the Medical School that he would receive a payment from Smithfield for his role in the Scholl Property transaction (¶¶3, 12, 16).  Finally, the Indictment alleges that Levine and Vrdolyak, in the course of executing their scheme, transmitted correspondence and communication "in interstate commerce by signals, over wire or radio, through the U.S. mails, or by private or commercial interstate carriers" (¶18).

As n.4 reflects, all of those matters alleged in Count One are also incorporated into Counts Two through Seven.  Hence it is from those allegations that the one mail fraud count and six wire fraud counts are fashioned.

Sufficiency of the Indictment

Under United States v. Ramsey, 406 F.3d 426, 429-30 (7th Cir. 2005) an indictment is sufficient if it:

> (1) states the elements of the offense charged; (2) fairly informs the defendant of the nature of the charge so that he may prepare a defense; and (3) enables him to plead an acquittal or conviction as a bar against future prosecutions for the same offense.

Accord, <u>United States v. Hausmann</u>, 345 F.3d 952, 955 (7th Cir. 2003); Fed. R. Crim. P. 7(c).

As taught in <u>United States v. Smith</u>, 230 F.3d 300, 305 (7th Cir. 2000)(citations and internal quotation marks omitted):

> In setting forth the offense, it is generally acceptable for the indictment to "track" the words of the statute itself, so long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished. However, an indictment that tracks the statutory language can nonetheless be considered deficient if it does not provide enough factual particulars to sufficiently apprise the defendant of what he must be prepared to meet. In order for an indictment to satisfy this second hurdle, we require, at a minimum, that it provide some means of pinning down the specific conduct at issue.

Lastly, in considering a motion to dismiss a court "must view all facts in the light most favorable to the government" (<u>United States v. Yashar</u>, 166 F.3d 873, 880 (7th Cir. 1999)).

Against that backdrop this opinion turns to the statutes that Vrdolyak has been charged with violating, as a necessary prelude to determining whether the offenses have been adequately alleged in the Indictment. As for the mail fraud and wire fraud statutes simpliciter, "Section 1341 forbids 'any scheme or artifice to defraud' that predictably employs the United States mails" (<u>United States v. Thompson</u>, 484 F.3d 877, 882 (7th Cir. 2007)), while by its terms Section 1343 forbids schemes and artifices that involve transmission, "by means of wire, radio, or television communication in interstate or foreign commerce, [of]

any writings, signs, signals, pictures, or sounds."

On their face Sections 1341 and 1343 speak only of "scheme[s] or artifice[s] to defraud" devised for purposes of "obtaining <u>money</u> or <u>property</u>" (emphases added).  But Congress enlarged that prosecutorial universe when it enacted Section 1346:

> For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

Here the United States has sought to invoke that concept by charging Vrdolyak with devising a scheme with Levine that deprived the Medical School of (1) the "intangible right of honest services" that Levine owed to the Medical School as a member of its Board of Trustees as well as (2) money and property that the Medical School stood to gain through its sale of the Scholl Property (¶2).  Vrdolyak has challenged the sufficiency of the first of those charges, the question now at hand.

<u>Intangible Right of Honest Services</u>

<u>Hausmann</u>, 345 F.3d at 956 speaks to what an indictment must allege when the United States has elected to pursue "the intangible-rights theory of federal mail or wire fraud liability."  It states (<u>id</u>., emphasis added):

> [A] valid indictment need only allege, and a finder of fact need only believe, that a defendant used the interstate mails or wire communications system in furtherance of a scheme to misuse his fiduciary relationship for gain <u>at the expense of the party to</u>

whom the fiduciary duty was owed."
At issue here is the meaning of the word "expense" as it relates to the Medical School.

According to Vrdolyak, Hausmann requires the government to show that the scheme contemplated the victim suffering "some pecuniary or concrete loss" in cases where it has charged a violation of Section 1346 (V. Mem. 5). Under that reading, if the Medical School would receive from Smithfield the most it would have obtained from any other potential buyer of the Scholl Property, it would not have suffered a "loss" as a result of Vrdolyak's and Levine's scheme. And without such a loss, Vrdolyak asserts, there can be no Section 1346 violation.

But according to the government, neither Hausmann nor any other Seventh Circuit case involving Section 1346 requires an allegation at the indictment stage, or proof at trial, that the victim suffered a pecuniary loss or that the defendant contemplated such a loss as a result of the scheme to defraud. It is enough, the United States maintains, for it to allege that the Medical School lost out on something far less tangible than money--specifically, "the benefit of an open and full bidding process to determine the actual fair market price of the Scholl Property" (U.S. Mem. 6).

This is not an easy issue, for the pertinent Seventh Circuit caselaw looks in both directions. It is thus necessary to piece

out an appropriate rationale to reconcile such seeming inconsistencies. But this Court has reviewed that caselaw, with the aid of authorities elsewhere, and what follows explains why Vrdolyak's reading is more persuasive--although, as explained later, his winning of that battle is overcome by his loss of the war even on his own reading.

As the ensuing discussion demonstrates, for the United States to charge adequately a Section 1346 violation in the context of a  private intangible-rights fraud case, not a public intangible-rights fraud case--a distinction that will be addressed more fully below--it must be prepared to show that the defendant at least contemplated that the victim would suffer a pecuniary harm as a result of the defendant's scheme to defraud. Fortunately for the United States, it has produced (after prodding) some information from which a jury could reasonably find Vrdolyak was aware that the Medical School could have sold the Scholl Property for more than the $15 million it received from Smithfield (U.S. Third Supp. Mem. 5-6). It has thus met Hausmann's requirements, leaving this Court in the rather unusual position of agreeing with the thrust of Vrdolyak's motion and yet nevertheless having to deny that motion.

Having so stated the end result of its legal analysis, this Court now takes several steps back to explain how that conclusion was reached. Hausmann serves as the logical starting point.

Hausmann involved personal injury lawyer Charles Hausmann
("Hausmann"), who referred several of his clients to a local
chiropractor "for chiropractic services paid from insurance
settlement proceeds" (345 F.3d at 954).  In exchange for those
referrals the chiropractor "made corresponding payments, equal to
twenty percent of the fees he collected for those services, to
third-party recipients" selected by Hausmann (id.).  These
recipients generally included a number of individuals or business
entities that had provided Hausmann with their services or in
which Hausmann held some interest (id.).  "Hausmann did not
disclose this kickback arrangement to his clients," individuals
who had pledged to pay Hausmann's law firm one-third of whatever
total it was able to collect on their behalf (id.).  Hausmann's
clients had further agreed that any medical expenses they
incurred as a result of their accidents would be covered from
their own portion of the settlements (id.).

Although Hausmann pleaded guilty to charges of conspiring to
commit mail and wire fraud, he later appealed his conviction on
the basis of an insufficient indictment (345 F.3d at 955).  Most
pertinent to Vrdolyak's current motion, Hausmann argued that "the
government failed to allege or prove...actual or foreseeable harm
to Hausmann's clients" (id.).  On that score Hausmann maintained
that his "clients had no right to the settlement funds paid to
[the chiropractor] nor, consequently, to the allocation of twenty

percent of those funds to expenditures designated by Hausmann"--no harm, in other words, befell his clients because they "were deprived of nothing to which they were entitled" (id.).

Not so, the Court of Appeals responded, pointing to two distinct types of harm suffered by Hausmann's clients (345 F.2d at 955). Hausmann's reasoning, it wrote (id., emphasis added):

> ignores the reality that [he] deprived his clients of their right to know the truth about his compensation: In addition to one third of any settlement proceeds he negotiated on their behalf, every dollar of [the chiropractor's] effective twenty percent fee discount went to Hausmann's benefit. Insofar as Hausmann misrepresented this compensation, that discount should have inured to the benefit of his clients.

"It is of no consequence," Hausmann continued, "that [the chiropractor's] fees (absent his discount) were competitive, or that clients received the same benefit as they would have absent the kickback scheme" (id.). What mattered was that "Hausmann illegally profited at the expense of his clients, who were entitled to his honest services as well as their contractually bargained-for portion of [the chiropractor's] discount" (id.). In other words, Hausmann deprived his clients not only of an intangible good ("the truth about his compensation"--his "honest services") but also of something far more concrete: the money represented by that 20% discount.

United States v. Montani, 204 F.3d 761 (7th Cir. 2000) lends additional support to that reading of Hausmann. There defendant

John Montani ("Montani") was convicted by a jury of violating Sections 1341 and 1346 by engaging in self-dealing transactions at the expense of his employer, Sears, Roebuck & Co. ("Sears")(id. at 763-65).  Specifically Montani--who "was responsible for selling off, at the best possible price, furniture that Sears could not or did not want to sell in its own stores or through its catalog" (id. at 763)--was found to have engaged in a scheme under which he sold the furniture for 10 cents on the dollar to co-conspirator Mark Israel ("Israel"), who then resold the furniture to a third party for an even higher price (id. at 764).  Israel and Montani would then split the proceeds, while "Sears never knew that Montani was receiving payments connected to the furniture sales nor [sic] that Montani had found, directly or indirectly, a purchaser who would pay 50 cents on the dollar for the merchandise" (id.).

In affirming Montani's conviction, our Court of Appeals held that sufficient evidence had been presented at trial to support a conviction under Section 1346 (345 F.3d at 769).  Most tellingly for present purposes, Montani explained that "[t]he transaction was fraudulent in that it deprived Sears of both property--the 20 cents on the dollar it lost--and the honest services of its employee" (id., emphasis added).  In short, just as in Hausmann, Montani's affirmation of the conviction under Section 1346 rested in part on evidence that Sears had been deprived of something

13

intangible (the fiduciary duty Montani owed it) as well as something far more concrete and pecuniary in nature: profits that Montani shared with Israel but that rightfully belonged to Sears.

In its various responses to Vrdolyak's motion the government seizes upon other language in <u>Hausmann</u> that, it argues, can be read as holding that an intangible-rights-fraud charge can be made out simply through evidence (1) that a fiduciary duty was breached and (2) that such breach was done for personal gain, without any added showing of pecuniary harm to the victim (see, e.g., U.S. Mem. 9). That other language reads (345 F.3d at 956, citing <u>United States v. Bloom</u>, 149 F.3d 649, 655-56 (7th Cir. 1998), which upheld the decision of this Court at the trial court level):

> Despite our doubts as to the applicability of these "intangible-rights theory" provisions of the mail and wire fraud statutes <u>to cases of breach of fiduciary duty with nothing more</u>, this Court has suggested that liability under this theory may nonetheless result where a defendant misuses his fiduciary relationship (or information acquired therefrom) for personal gain.

If taken alone and out of context, that excerpt could be read to support the United States' position. But the government's argument sidesteps the fact that very shortly after that quoted statement <u>Hausmann</u>, 345 F.3d at 956 deploys the critical language quoted at pages 8-9 of this opinion--language that makes clear that a valid indictment for a Section 1346

violation must encompass two requirements:  not only that a fiduciary relationship was misused for the defendant's own personal gain but also that the scheme came "at the expense of the party to whom the fiduciary duty was owed" (id., emphasis added).  Even more importantly--and again as explained earlier-- when the time came for Hausmann to apply that legal statement to the actual facts of that case, it took defendant to task for depriving his clients both of his honest services and of the 20% discount (id. at 957).  That outcome evinces Hausmann's conclusion that breach of a fiduciary duty and personal gain alone do not an intangible-rights-fraud make, at least not when the violation has taken place in the "private" rather than the "public" sphere (more on the private v. public distinction next). Instead, at least as Hausmann puts it, the government must show that some pecuniary harm was expected to befall the victim as well.

As promised, something must be said about the difference between "private" and "public" intangible-rights-fraud cases. That is a distinction that Vrdolyak has consistently highlighted and that merits discussion here, for the legal arguments advanced by the United States hinge on Seventh Circuit cases that involve Section 1346 violations committed (or allegedly committed) in a context different from the one presented here.

Simply put, under Seventh Circuit caselaw the fact that the

Medical School is a private entity, rather than (say) a municipality or government agency, increases the burden on the United States in a Section 1346 charge. When victims are of the former type, as in Hausmann and Montani, the cases call upon the government to allege and ultimately show that the victims suffered or were expected to suffer a pecuniary harm. But when victims are of the latter type, no such showing of harm is necessary--a legal point demonstrated by the language employed in a number of Seventh Circuit cases dealing with Section 1346 in the "public" context (see Bloom, United States v. Fernandez, 282 F.3d 500 (7th Cir. 2002), United States v. Leahy, 464 F.3d 773 (7th Cir. 2006) and Thompson). Bloom, Fernandez, Leahy and Thompson speak only of a breach of fiduciary duty and personal gain to the defendant and, unlike Hausmann, make no mention of "expense" to the victim.

Bloom, for example, held that "in an intangible rights case what the employer loses is the employee's loyalty, not (necessarily) money or other property" (149 F.3d at 655), later adding that "[a]n employee deprives his employer of his honest services only if he misuses his position (or the information he obtained in it) for personal gain"[7] (id. at 656-57).

---

[7] In fact, it is that language, quoted in Hausmann, that the United States relies upon to argue that even Hausmann does not require a showing of tangible pecuniary harm. But the fact that the language comes directly from Bloom, rather than from a Section 1346 case involving fraud on a private entity, is yet

Piggybacking off of Bloom, Fernandez, 282 F.3d at 507 said "[t]his Circuit has never required the government to establish a 'contemplated harm to the victim.'" And there has been more to the same effect--see also id., explaining that "Bloom says nothing about a contemplated harm to a victim, much less that such harm must be established in order to sustain defendants' convictions"; Leahy, 464 F.3d at 786-87, Thompson, 484 F.3d at 883 (emphasis added), stating that "Section 1346 establishes that fraud committed against an employer need not put the employer out of pocket").

But that language cannot be relied on to anchor the government's argument that it is neither required to allege now nor to show ultimately that the Medical School stood to suffer a pecuniary loss. Bloom and its progeny are all distinguishable from Hausmann and Montani because they involved victims or alleged victims that were public entities, not private ones such as the Medical School (see Bloom, 149 F.3d at 650, where the alleged victim was the City of Chicago; Fernandez, 282 F.3d at 502, where the victim was the Village of Lyons; Leahy, 464 F.3d at 778, where the City of Chicago was the victim; Thompson, 484 F.3d at 878, where the alleged victim was the State of

---

another reason why the government errs in its interpretation of Hausmann.

Wisconsin).[8]

To be sure, our Court of Appeals has never expressly
discussed why the United States must face an additional burden in
prosecuting a Section 1346 violation in the private-victim
context, as contrasted with doing so in the public-victim

---

[8]  U.S. Mem. 7 and U.S. First Supp. Mem. 3-4 also seek to
rely on United States v. George, 477 F.2d 508 (7th Cir. 1973).
George came down at a time when the bloom was still on the rose
of expansion of the "money or property" requirement of Sections
1341 and 1343 to encompass "honest services"--a notion that, if
this Court's recollection is correct, may have had its origin in
the fertile imagination of prosecutors in this district's United
States Attorney's office.  In George the defendant had been
convicted of depriving his employer Zenith Corporation ("Zenith")
of his honest and loyal services in violation of Section 1341
(id. at 510), and the court stated that "[s]ince the gravamen of
the offense is a 'scheme to defraud,' it is unnecessary that the
Government allege or prove that the victim of the scheme was
actually defrauded or suffered a loss" (id. at 512).  It later
added that Zenith had been harmed simply because the defendant
"deprived [it] of material knowledge that" a third-party was
willing to sell his products to Zenith "for substantially less
money" (id. at 513).  But George and cases like it were rejected
by the Supreme Court in McNally v. United States, 483 U.S. 350,
360 (1987), which found that intangible-rights approach an
unwarranted reading of the statutory language.  We are now in the
post-Section 1346 era, inaugurated when Congress passed that
statute to override McNally (see Thompson, 484 F.3d at 882).
Neither Hausmann nor Montani mentions George, and those more
recent opinions must be viewed as an accurate exposition of the
law.  Nor can the government's citations to such cases as
Lombardo v. United States, 865 F.2d 155 (7th Cir. 1989), Ranke v.
United States, 873 F.2d 1033 (7th Cir. 1989) and United States v.
Briscoe, 65 F.3d 576 (7th Cir. 1995)(see U.S. Third Supp. Mem.
11-14) alter the analysis, not simply because they too antedate
Hausmann, but also because none involved the honest services
doctrine (each involved counts brought solely under Sections 1341
or 1343).

context.[9]  Yet the fact remains (1) that <u>Hausmann</u> conspicuously

requires a showing that the scheme contemplated misuse of the

fiduciary position for gain "at the expense" of the victim (the

fiduciary's principal), while <u>Bloom</u> and its ilk do not, and

(2) that <u>Hausmann</u> defines that concept in terms of both the

honest services <u>and</u> money of which Hausmann's clients were

deprived.  That distinction cannot fairly be ignored.

Moreover, though our Court of Appeals has been silent as to

<u>why</u> "private" and "public" Section 1346 cases should be treated

differently, other circuits have not.  This opinion turns, then,

to those other sources for insight.

<u>United States v. deVegter</u>, 198 F.3d 1324 (11th Cir. 1999) is

particularly instructive in that regard.  There the court

stressed that "the 'intangible right of honest services' has

different implications...when applied to public official

malfeasance and private sector misconduct" (<u>id</u>. at 1328).

<u>deVegter</u>, <u>id</u>. (citations, footnotes and internal quotation marks

---

[9]  That court has on occasion acknowledged that not all
Section 1346 cases are alike, even if it has not provided some
kind of underlying rationale for treating them differently.  Thus
<u>Ranke</u>, 837 F.2d at 1038 observed that "[s]ince <u>McNally</u> was
decided, we have not reviewed a '<u>George</u>-type' commercial kickback
case and, thus, have not had the opportunity to re-examine that
type of scheme."  Instead the only post-<u>McNally</u> honest services
cases the court had dealt with by that point "mostly involved
political corruption; or schemes to defraud government agencies;
or financial schemes to deplete the assets of a corporation; or a
direct fraud on a buyer by a seller, or on a client by an
attorney, without the middleman necessary for a kickback scheme"
(<u>id</u>., internal citations omitted).

omitted) went on to explain:

> Public officials inherently owe a fiduciary duty to the
> public to make governmental decisions in the public's
> best interest.  If the official instead secretly makes
> his decision based on his own personal interests-as
> when an official accepts a bribe or personally benefits
> from an undisclosed conflict of interest-the official
> has defrauded the public of his honest services.  When
> the prosecution can prove the other elements of the
> wire fraud offense, taking kickbacks or benefitting
> from an undisclosed conflict of interest will support
> the conviction of a public official for depriving his
> or her constituents of the official's honest services
> because [i]n a democracy, citizens elect public
> officials to act for the common good.  When official
> action is corrupted by secret bribes or kickbacks, the
> essence of the political contract is violated. Illicit
> personal gain by a government official deprives the
> public of its intangible right to the honest services
> of the official.

> On the other hand, such a strict duty of loyalty
> ordinarily is not part of private sector relationships.
> Most private sector interactions do not involve duties
> of, or rights to, the "honest services" of either
> party.  Relationships may be accompanied by obligations
> of good faith and fair dealing, even in arms-length
> transactions.  These and similar duties are quite
> unlike, however, the duty of loyalty and fidelity to
> purpose required of public officials.  For example,
> [e]mployee loyalty is not an end in itself, it is a
> means to obtain and preserve pecuniary benefits for the
> employer.  An employee's undisclosed conflict of
> interest does not by itself necessarily pose the threat
> of economic harm to the employer.  A public official's
> undisclosed conflict of interest, in contrast, does by
> itself harm the constituents' interest in the end for
> which the official serves-honest government in the
> public's best interest.

And so, quoting a Sixth Circuit opinion and citing like cases

from other circuits, deVegter, id. at 1329 went on to hold:

> The prosecution must prove that the employee intended
> to breach a fiduciary duty, and that the employee
> foresaw or reasonably should have foreseen that his

employer might suffer an economic harm as a result of the breach.

Those views were echoed and followed in <u>United States v. Vinyard</u>, 266 F.3d 320, 326-27 (4th Cir. 2001), which like <u>deVegter</u> cabined private-sector misconduct crimes in the same way and cited a battery of cases from other circuits (including <u>deVegter</u>) that applied the law in the same fashion. It would extend this already overlong opinion unduly to go into comparable detail--it is enough simply to refer to the two cases cited here and the laundry list of cases that they cite.

Missing from that <u>Vinyard</u> laundry list of courts elsewhere was our own Court of Appeals. But it is difficult to view as accidental the fact that two years post-<u>Vinyard</u> the Seventh Circuit adopted its own version of a limiting principle through the language in <u>Hausmann</u>. And such a limitation is all of a piece with the Seventh Circuit's expressed concern over the growing scope of Section 1346 (see <u>Thompson</u>, 484 F.3d at 882, writing that "[b]ecause no one <u>really</u> thinks that [Section 1346] treats all legal errors by public employees as criminal, it has been necessary to cabin the reach of the statute"). In the "public" context the court had already achieved that cabining effect by requiring the United States to show that the defendant personally profited as a result of breaching the fiduciary duty he owed a city, state or public agency (see <u>Bloom</u>, 149 F.3d at 655). <u>Hausmann</u>'s use of the word "expense" (345 F.3d at 956) and

its decision to define that word in terms of both honest services and money (id. at 957) have--like the decisions in so many other circuits--simply added another cabining factor in the "private" context.[10]

In sum (at last), the government's legal argument fails because Hausmann, and Montani as well, require a showing that the Medical School was expected to suffer a pecuniary loss as a result of Vrdolyak's scheme to defraud--a showing that was not implicit in the language of the Indictment. But because the government has now proffered evidence that the Medical School actually had the prospect of deriving more from the sale of the Scholl Property than it collected from Smithfield, Vrdolyak's motion to dismiss in those terms is denied.[11]

_____

[10]   In that regard no significance attaches to the point made at U.S. Supp. Mem. 5 that United States v. Warner, 498 F.3d 666, 697-98 (7th Cir. 2007) quoted both Hausmann and Bloom in "requir[ing] the prosecution to prove that misuse of the office was intended for personal gain," without referring to a showing of pecuniary harm to the victim. Like Bloom, Warner involved an intangible-rights fraud committed in the public context (498 F.3d at 675), and nothing in that later case goes to the quite different question of whether Hausmann imposes an additional burden of showing contemplated or actual pecuniary loss when the same violation is prosecuted in the private context.

[11]   This ruling does not carry with it the need for a superseding indictment. Count One ¶1 speaks of the charged scheme as one "to deprive the Chicago Medical School of money, property, and the intangible right to the honest services of Levine." Those first two deprivations plainly involve pecuniary harm, and it does no violence to the Indictment's language to include that already pleaded element as an ingredient of the third alleged deprivation.

<u>Knowledge of Levine's Fiduciary Duty</u>

Next Vrdolyak argues that Counts One through Seven should be dismissed because the Indictment does not sufficiently allege that Vrdolyak knew the nature of Levine's fiduciary duty to the Medical School (V. Mem. 10-13). As Vrdolyak has it, the Indictment charges only that he knew Levine had failed to disclose to the Medical School that he stood to gain from a deal with Smithfield, but it does not specify that Vrdolyak knew Levine had a duty to disclose in the first place. Hence, he maintains, the Indictment fails to allege sufficiently that he knowingly aided and abetted the fraud, as is required by Section 2 (<u>id</u>. 11-12).

Vrdolyak's argument fails. In reviewing the sufficiency of an indictment, a court's inquiry should be "not whether the indictment could have been framed in a more satisfactory manner, but whether it conforms to minimal constitutional standards" (<u>United States v. Allender</u>, 62 F.3d 909, 914 (7th Cir. 1995)). Thus the Indictment need not delve into the exact details of Levine's fiduciary duty to the Medical School to assert that Vrdolyak knew of its breach. Instead it suffices to state more generally that Vrdolyak knew Levine would abuse his position as a Medical School trustee by participating in the charged fraudulent scheme.

That the Indictment has done. For example, ¶3 (emphasis

added) states in part:

> It was part of the scheme that...Levine, with
> VRDOLYAK'S knowledge, <u>would misuse, and did misuse
> Levine's position and influence as a [Medical School]
> trustee</u> to arrange a sale of the Scholl Property to
> Smithfield Properties in exchange for a payment that
> would benefit Levine.

And ¶4 (emphasis added) reads in part:

> VRDOLYAK and Levine <u>agreed</u> that VRDOLYAK would identify
> a purchaser for the Scholl Property and <u>that Levine
> would misuse his position and influence as a [Medical
> School] trustee</u> to ensure that this purchaser obtained
> the Scholl Property in exchange for a kickback to
> Levine.

And finally ¶16 (emphasis added) asserts:

> As VRDOLYAK knew, <u>notwithstanding Levine's position as
> a member of the [Medical School] Board of Trustees</u>,
> Levine intentionally concealed from and failed to
> disclose to [the Medical School] material facts
> relating to the financial arrangements for Smithfield
> Properties's purchase of the Scholl Property, <u>including
> VRDOLYAK and Levine's agreement that Levine would
> misuse his position and influence as a [Medical School]
> trustee</u> and accept a kickback in connection with that
> transaction.

Those allegations readily fill the bill as to Vrdolyak's

knowledge of Levine's fiduciary duty to the Medical School,

sufficiently so as to support a charge that Vrdolyak violated

Section 1346.  That aspect of Vrdolyak's motion to dismiss the

Indictment is also denied.

<u>                    Vagueness of Section 1346 as Applied</u>

_____Finally, Vrdolyak challenges the Indictment on the grounds

that if the circumstances it presents are sufficient to

constitute a scheme to defraud within the meaning of Section

1346, that statute is vague as applied to the facts (V. Mem. 13).

Vrdolyak fares no better on that argument.

In that respect United States v. Mazurie, 419 U.S. 554, 550
(1975) states a truism:

> It is well established that vagueness challenges to
> statutes which do not involve First Amendment freedoms
> must be examined in the light of the facts of the case
> at hand.

And just six months ago Warner, 498 F.3d at 697 quoted this

teaching from Posters 'N' Things, Ltd. v. United States, 511 U.S.

513, 525 (1994):

> The void-for-vagueness doctrine requires that a penal
> statute define the criminal offense with sufficient
> definiteness that ordinary people can understand what
> conduct is prohibited and in a manner that does not
> encourage arbitrary and discriminatory enforcement.

So if Vrdolyak really could not have known that his joinder with

Levine in devising a scheme whose success hinged on Levine

exploiting his position of trust within the Medical School would

run afoul of the prohibition in a Section 1346-Section 1341 or a

Section 1346-Section 1343 combination, then Section 1346 would be

void for vagueness (cf. Warner, 498 F.3d at 697).

But Hausmann clearly put Vrdolyak on notice that his

behavior amounted to criminal fraud.  Just as was the case there,

the Indictment here alleges that the charged scheme, implemented

by the use of both the interstate mails and wire communication

systems, involved the intended abuse of a fiduciary duty owed to

the victim.  There is only one twist:  Unlike Hausmann, Vrdolyak

did not himself owe a fiduciary duty to the victim. Instead that duty was owed by Levine.

But that distinction does not render Section 1346 unconstitutionally vague in this instance. As already explained at pages 23-24, the Indictment more than adequately alleges that Vrdolyak knew of Levine's fiduciary duty to the Medical School. Vrdolyak thus had every reason to know that entering into the charged scheme to defraud with Levine--a scheme whose success depended on Levine's misuse of his position as a Medical School trustees--would put him squarely within the crosshairs of Section 1346.[12]

## Conclusion

This Court will not ascribe, as the government's arguments might perhaps be read to suggest, some lack of care to our Court of Appeals' crafting of critical language in <u>Hausmann</u> and <u>Montani</u>--particularly when that language signals the selfsame requirement that so many other Courts of Appeals have imposed on Section 1346 charges in the private-sector context. But that requirement has now been satisfied by the government's most recent submissions, and none of Vrdolyak's other challenges to Counts One through Seven of the Indictment have merit.

---

[12] That amply distinguishes the circumstances here from those addressed by this Court's colleague Honorable Rebecca Pallmeyer in <u>United States v. Warner</u>, 292 F.Supp.2d 1051, 1063 (N.D. Ill. 2003), where she expressed some doubt as to the clarity of Section 1346 in the situation before her.

This Court therefore denies Vrdolyak's motion to dismiss those Counts. This action is set for a next status hearing at 1:00 p.m. March 13, 2008 (and because the purpose of that hearing is purely procedural--the setting of a schedule--this Court will waive Vrdolyak's appearance if he so elects after conferring with counsel).

_____
Milton I. Shadur
Senior United States District Judge

Date:  March 10, 2008

In the course of briefing the current motion, both parties provided this Court, at its request, with multiple memoranda. Vrdolyak's "Corrected Motion To Dismiss Counts One through Seven" will be cited "V. Mem. --" and the United States' first response to that motion will be cited "U.S. Mem. --."  Three further responses filed by the United States will be cited "U.S. First Supp. Mem. --,"  "U.S. Second Supp. Mem. --" and "U.S. Third Supp. Mem. --."  Vrdolyak's three replies to those responses are cited "V. R. Mem. --," "V. Second R. Mem. --" and "V. Third R. Mem. --."

That trail of memoranda was asked for by this Court to help it assess the central argument advanced in Vrdolyak's motion to dismiss:  whether <u>United States v. Hausmann</u>, 345 F.3d 952 (7th Cir. 2003) required the United States to allege that the victim of a Section 1346 violation suffered pecuniary harm as a result of being deprived of the defendant's honest services (see V. Mem. 3-9; U.S. Supp. Mem. 1-2).  Later this Court also asked the United States to discuss what evidence it would present if a trial involved only the final count of the Indictment (the Section 666(a)(2) violation), as distinct from a trial that involved all eight counts (see U.S. Second Supp. Mem. 7-9; V. Second R. Mem. 1, 8-9).  That information was needed to help this Court assess whether a verdict on the Section 666 count would

arguably be tainted by evidence presented against Vrdolyak on the mail and wire fraud counts if those were later held invalid.

Finally and most critically, this Court asked the United States whether--if Hausmann did indeed require an allegation of pecuniary harm--it could adduce any facts showing that the Medical School could have sold the Scholl Property for more than $15 million (the amount ultimately paid by Smithfield). In its third supplemental response the United States finally proffered facts--as set out at pages 4-5 of the text--that, if credited by a jury, suggest that the Medical School may have been able to sell the Scholl Property for an additional $500,000 (see U.S. Third Supp. Mem. 5-6).

To be sure, this Court's decision to request such extensive briefing from both parties, in addition to the functional equivalent of a Santiago proffer from the United States, was an unusual one. But some assurance was needed that the United States was in a position to demonstrate that the Medical School had suffered pecuniary harm as a result of the Vrdolyak-Levine scheme before this Court would order Vrdolyak to stand trial on eight charges when potential convictions on seven of them--those stemming from the mail and wire fraud counts--could be overturned on appeal based on a failure to show the kind of harm spoken of in Hausmann, and that could in turn jeopardize an otherwise sustainable conviction on the eighth count.