```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
                       EASTERN DIVISION
```

UNITED STATES OF AMERICA,        )
                                 )
              Plaintiff,         )
                                 )
    v.                           )      No.  07 CR 298
                                 )
EDWARD R. VRDOLYAK,              )
                                 )
              Defendant.         )

                         MEMORANDUM

This Court has received the "Government's Offer of Proof" following the completion of the sentencing of defendant Edward Vrdolyak ("Vrdolyak"). This supplemental memorandum is being issued because that offer regrettably mischaracterizes the record before this Court at the time of sentencing in some material and important respects.

First, the recital in Part I of what is captioned "The Farley Group's Several Offers and Efforts To Purchase the Scholl Property" does accurately reflect what was before this Court as to the Farley Group's <u>earlier</u> efforts to purchase the property at 1001 North Dearborn Street, Chicago from the then Chicago Medical School ("CMS")--that is, the efforts that preceded the June 5, 2003 emergency meeting of the CMS Board that was called to decide on the sale of that property. But the first sentence in Government ¶11 simply does not conform to the facts. Instead, for sentencing purposes this Court expressly found on the basis of the objective evidence before it--as contrasted with what may

have been in Pam Farley's mind (Government ¶11) or what "[t]he Farley Group did not consider" its increased offer, made a week <u>after</u> the Board meeting, to be (Government ¶13)--that the Farley Group had indeed been requested to submit its best offer before the June 5 meeting, directly contrary to what is stated in Government ¶14.[1]

Moreover, although to this Court's recollection none of the parties' submissions (including the government's current offer of proof) had called this fact to this Court's attention, Vrdolyak's post-sentencing offer of proof states that all Farley Group offers (wholly unlike Smithfield's) were made subject to CMS's payment of a broker's commission. This Court does not recall having seen the May 30, 2003 "Agency Disclosure and Commission Agreement for Unrepresented Seller," submitted by the Farley Group's broker to CMS, until it received Vrdolyak's post-sentencing offer of proof. But if that document, calling for CMS's payment of a 4% broker's commission, had indeed been intended as a condition of the broker's June 2, 2003 letter offer on behalf of the Farley Group, that $15 million offer (made just

---

[1] Any attempted collectivization of the "Farley Group," rather than focusing on individuals, is another indicium of the weakness of the government's position. Significantly, whatever she may now profess as to her state of mind, the fact is that Pam Farley herself never communicated with the CMS people--rather, all communications were between the Farley Group's broker referred to here and the CMS people or their lawyers. Revisionist history is not the stuff of which judicial decisions are--or should be--made.

2

before the June 5 meeting) would have netted $14.4 million to CMS (after the 4% commission), _less than_ Smithfield's $15 million figure.

To return to the "best offer" subject, that same broker (who acted throughout on behalf of the Farley Group) had long since told the government, when she was interviewed, that she recalled having been asked to "prepare the Farley Group's best offer" and to submit it to CMS's counsel in anticipation of an early decision. Some added indication of the lack of force in the Government's effort to rely instead on matters that it ascribes to the Farley Group's asserted mindset--uncommunicated to CMS--is exemplified by Government ¶12, which seeks to find support in its lame assertion that nothing in the letter sent to the Farley Group's broker the day after the meeting "referred to the Farley Group's June 2 offer as a best or final offer." It is a total non sequitur to ascribe any significance to that purported omission, for there would obviously have been no reason--given the content of that letter--for the CMS representative to include such a statement.

Similarly, Government Ex. I (a June 12 Letter of Intent submitted by the broker on behalf of the Farley Group) is obviously a weak reed on which to place any stress whatever. In that respect, by pointing to that after-the-fact submission the government has simply attempted to add to its earlier reliance on

3

the uncommunicated asserted mindset of the Farley Group as of the time of the June 5 CMS Board meeting. That effort--a kind of post hoc, ergo propter hoc contention--carries no persuasiveness.

Indeed, it bears emphasis that Government ¶18 (which is included in Part II, "Loyola University's Offer To Purchase the Scholl Property") specifically reflects the directive given to Loyola University's real estate representative and advisor Michael Haney <u>before</u> the June 5 meeting, a directive that directly supports the finding made by this Court. And Vrdolyak's offer of proof sets out that a member of Loyola's Board of Trustees has confirmed that the identical message was conveyed to him by Stuart Levine, also before the June 5 emergency meeting. No reason exists that CMS would treat the two interested parties, Loyola University and the Farley Group, differently in that respect.[2] It is truly regrettable to find the government sponsoring the after-the-fact, self-serving and unverifiable characterizations by Farley Group representatives as though they provided an accurate portrayal in the face of this Court's contrary determination.

As for the Loyola University situation, what must not be forgotten is that the defendant before this Court for sentencing was Vrdolyak, not Stuart Levine. And the relevant question, both

---

[2] Indeed, that same message--asking for <u>its</u> best offer--was conveyed to Smithfield as well during the same time frame.

4

for Sentencing Guideline purposes and ultimately for purposes of considering and applying the 18 U.S.C. §3553(a)("Section 3553(a)") factors, is what claimed loss to CMS is ascribable to Vrdolyak.

On that score the uncontroverted fact is that Vrdolyak had every incentive--not out of altruistic motives, but in his own interest--to maximize the Smithfield offer, to make sure that it represented the fair market value of the property. After all, it was only if Smithfield proved successful in acquiring the property that Vrdolyak would receive a finder's fee for having produced it as a prospective purchaser. And that self-interest was directly confirmed by Vrdolyak's actual conduct: When he learned that Smithfield had sought to acquire the property for a much lower price ($9.5 million) and that others had indicated an interest at a much higher figure, it was his angry insistence that caused Smithfield to up the price to the $15 million figure contained in its revised offer. If knowledge of higher numbers coming from other interested parties had come to him, his prior conduct provides every assurance that--again in his own educated self-interest--he would have urged that Smithfield up the ante accordingly. In that respect it is the government's stubborn refusal to focus on Vrdolyak, the only defendant before this Court, that has continued to warp its presentations.

Importantly, even if the Sentencing Guidelines' concept of

5

"loss" were found to encompass the added $500,000 referred to in the letter from Loyola University's broker (despite the conditions implicit in that letter, including the fact that Loyola's Board had not approved the proposal (and had not even inspected the property) before the June 5 meeting, and despite the other factors that typically lead any seller to choose a buyer that is much farther along in the process of shaping a purchase transaction over one who might or might not come through at a higher number),[3] the facts regarding Vrdolyak's role, plus all of the other factors set out in Section 3553(a), would still heavily outweigh that advisory figure.  Hence the sentence that this Court has imposed would remain sufficient but not greater than necessary to comply with all the purposes set forth in Section 3553(a)(2)(as well as satisfying the other provisions of Section 3553(a)) even under that hypothetical.

Two final matters should be adverted to briefly, though with regret.  At the time of sentencing the government identified the matters on which it proposed to offer proof--the areas that this Court has dealt with in this memorandum.  Under the circumstances this Court determined that could be done by a post-sentencing written offer of proof to flesh out the record to cover those

---

[3] It again bears repeating that the government's extremist position of also characterizing the Vrdolyak finder's fee as a "loss" to CMS has no warrant either in practice or in the evidence before this Court.

6

matters, which the parties had addressed in their very extensive pre-sentence submissions.

That being so, there is no justification whatever for the government's inclusion, as part of its current submission, of the footnoted information at Government ¶26 n.2--something that had never been brought before this Court in the way of government argument or otherwise (it seems to be an effort to muddy up Smithfield post hoc, and it really occupies no legitimate place in the government's submission).

Lastly, Government ¶29 states that Smithfield's representative who signed the Compensation Agreement with Vrdolyak "does not recall ever discussing the finder's fee as a percentage of the purchase price." Throughout the parties' presentation to this Court it had been this Court's understanding that the finder's fee was 10% of the Smithfield offer for the property--and to this Court's recollection no one ever sought to suggest that this Court's repeated references to that understanding were somehow mistaken. But again what is critical and controlling is the point already made--that Vrdolyak's entitlement to <u>any</u> finder's fee was totally dependent on Smithfield being the successful purchaser of the property, and again that gave him common cause with CMS in seeking to provide

7

it with full fair market value for its property.

```
                          _____
                          Milton I. Shadur
                          Senior United States District Judge
```

Date:  March 10, 2009